54 CCPA

**Application of Floyd E. NAYLOR.**
**Patent Appeal No. 7662.**

United States Court of Customs and Patent Appeals.

Dec. 8, 1966.

Rehearing Denied Feb. 9, 1967.

Paul L. Gomoy, J. Arthur Young, Donald J. Quigg, L. Malcolm Oberlin, Bartlesville, Okl., for appellant.

Joseph Schimmel, Washington, D. C. (Jack E. Armore, Washington, D. C., of counsel), for Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH and ALMOND, Judges.

WORLEY, Chief Judge.

This appeal is from the decision of the Board of Appeals affirming the rejection of claims 2, 5 and 8–12 in appellant's application [1] for "Process for Production of Rubbery Polymers" as "unpatentable over Crawford [2] in view of Badische-Anilin [3] under 35 U.S.C. § 103."

The invention relates to a process for polymerizing 1,3-butadiene to produce a rubbery polybutadiene containing at least 80% of 1,2-addition [4] product. Appel-

---

1. Serial No. 62,552, filed October 14, 1960.

2. Crawford (Australian patent) 215,043 November 1, 1956.

3. Badische-Anilin (Belgian patent) 554,242 May 16, 1957.

4. In addition to the cis–1,4– and trans–1,4– configurations discussed in In re Foster, 343 F.2d 980, 52 CCPA 1808, it appears that polybutadiene may exist in the

1,2–addition form represented by the exemplary repeating unit:

$$-\left[-CHCH_2-\right]_n$$
$$CH=CH_2$$

The carbon atom to which the $-CH=CH_2$ group is attached is termed an asym-

lant uses a catalyst comprising molybdenum pentachloride ($MoCl_5$), an organoaluminum compound ($AlR_3$) and a minor amount of a promoter such as an aliphatic or cyclic ether, an amine or an amide. According to the specification, previous processes of polymerizing butadiene employing the Ziegler-type $MoCl_5$ and organoaluminum catalyst complexes yielded only small amounts of a "resinous, insoluble polymer." Addition of the promoter to the particular catalyst system is said to make possible the formation, in high yields, of elastomeric 1,2-polybutadiene. The process is reflected in claim 2:

> 2. A process for preparing a rubbery polybutadiene containing at least 80 per cent of 1,2-addition which comprises contacting 1,3-butadiene under polymerization conditions with a catalyst comprising molybdenum pentachloride and a compound having the formula $R_3Al$, wherein R is selected from the group consisting of alkyl, aryl, alkaryl, aralkyl and cycloalkyl radicals, said contacting occurring in the presence of a promotor compound selected from the group consisting of dialkyl ethers, cyclic ethers, ethers of ethylene glycol, tertiary amines containing not more than one aryl group, N,N-dialkyl-substituted amides, and alkylideneamines.

In rejecting the claims, the examiner noted that Crawford discloses processes for the polymerization of butadiene which utilize Ziegler-type catalyst systems. In Example 43, particularly relied upon by the examiner, Crawford employs a molybdenum pentachloride-aluminum trialkyl catalyst. That process yielded a butadiene polymer of unidentified structural configuration which is described only as a "light grey powder." According to Crawford, the synthetic polymers produced by his disclosed polymerization systems "differ widely in their properties depending upon the ingredients and conditions used for polymerization." Crawford further states that his polymerization products

> * * * show a wide variety of arrangements of monomer residues and can show a greater molecular symmetry than previous diene polymers. The products * * * do not depend for the principal characteristics only upon the monomer or combination of monomers polymerised and upon molecular weight of the polymers formed, but also depend largely upon the extent to which the diene monomers polymerise through their 1,2 (or 3,4) carbons or their 1,4 carbons and, in the latter case, whether cis or trans double bonds are left in the polymer chain. * * *

The examples of Crawford bear out those observations. Employing aluminum triethyl and titanium tetrachloride in various mole ratios, for example, Crawford obtained polybutadienes having microstructures ranging from 42% 1,2-addition, 58% 1,4-trans addition, and

metric carbon atom. Thus the 1,2-addition product itself exists in several configurations: (1) *isotactic*, where the $-CH=CH_2$ substituent is placed in a regular manner along the length of the polymer chain, as shown. (2) *syndiotactic*, where there exists a regular alternation in the position of the $-CH=CH_2$ group along the length of the chain, viz.

$$CH=CH_2$$
$$-\left[-CHCH_2 - CH\ CH_2 -\right]-$$
$$CH=CH_2 \qquad n$$

(3) *atactic*, where the $-CH=CH_2$ substituent is placed in random geometric positions along the chain.

According to Kirk-Othmer, Encyclopedia of Chemical Technology, 2nd Edition, Interscience Publishers (1965) under "Diene Polymers," the 1,2-isotactic and 1,2-syndiotactic configurations each give rigid, crystalline materials while the atactic configurations result in soft elastomers.

no detectable 1,4-cis addition to about 5% 1,2-addition, 70–80% 1,4-trans addition and 15–25% 1,4-cis addition. Products possessing predominantly 1,4-trans addition were characterized as crystalline while those possessing greater amounts of 1,4-cis addition were more amorphous and rubbery. In no example did Crawford obtain a butadiene polymer containing more than 53% 1,2-addition, and that polymer, characterized as a "soft," "slightly crystalline," "viscous sticky product," resulted from the use of titanium tetrachloride and tri-n-amyl aluminum as a catalyst.

The Badische-Anilin reference also relates to polymerization processes employing Ziegler-type catalyst systems. In particular, it describes the polymerization of certain mono-olefins, such as ethylene and propylene, in the presence of a three-component catalyst system. Two of the components—a hydrocarbon compound of the metals *aluminum*, gallium, indium, zinc or cadmium, and a halide of the metals titanium, zirconium, vanadium, chromium, hafnium, thorium, niobium, tantalum, *molybdenum*, tungsten or uranium—are conventional components of Ziegler catalyst systems. Addition of the third component—an ether or amine which forms "complex compounds with the components of the catalyst"—was often found to increase the speed and average degree of polymerization of the mono-olefin as well as the yield of polymer.

We think the significant question to be answered here is whether, given the concept of a rubbery polybutadiene product containing at least 80 per cent of 1,2-addition, the process recited in the claims is an obvious process of producing *that product*. Viewing the two references relied upon, we do not think it is. Nor, apparently, did the examiner, for he stated:

* * * Obviously neither reference alone anticipates appellant's process. Obviously, the combination also does not teach that one can produce a "rubbery polybutadiene containing at least 80% of the 1,2 addition" by adding the

promotors of Badische-Anilin to the $MoC1_5$–$A1R_3$ of Crawford. * * * It is readily admitted that the precise structure and physical nature of the polybutadienes resulting from following the teachings of Badische-Anilin could not be predicted with any accuracy. * * *

Rather, the examiner thought "it would be obvious to one skilled in the art to use the ether or amide promotors of Badische-Anilin with the $MoC1_5A1R_3$ catalyst of Crawford for the polymerization of butadiene" because "the three advantages described by * * * [Badische-Anilin]" would "provide *reasons* why one would try the promotors of Badische-Anilin in the *process* of Crawford." The board agreed, adding

* * * The failure of the references to teach that a rubbery butadiene polymeric product is obtained from the obvious process is not seen to aid appellant's cause. Obviousness does not require absolute predictability of the properties to be obtained. * * *

It seems to us that the error in the Patent Office position is best summed up by the following excerpt from the solicitor's brief:

* * * the preceding discussion has already considered at length why the claimed *process* for preparing polybutadiene—employing the claimed starting material, catalyst system and promotor—would have been obvious to one skilled in this art from the combined teachings of the references. Although the references do not specifically indicate that the addition of a promotor to the Crawford process would necessarily result in a rubbery polymer having a high 1,2-addition, apparently this is an inherent result which would flow naturally from combining the teachings of the prior art. * * *

However, appellant is not claiming simply a process for preparing polybutadiene. Rather it is a process for preparing a particular polybutadiene having a particular microstructure and particular properties. Concededly, the reference combination does not teach that the

Crawford process, as modified by the disclosure of Badische-Anilin, would produce the product sought by appellant and recited in his claims. We cannot ignore the particular product unexpectedly produced by the claimed process, as the Patent Office apparently has done, in determining whether the claimed subject matter *as a whole* is obvious. Moreover, the fact that a rubbery polybutadiene having high 1,2-addition might be inherent in following the combined teachings of the prior art is quite immaterial if, as the record establishes here, one of ordinary skill in the art would not appreciate or recognize that inherent result. As we recently pointed out in In re Spormann, 363 F.2d 444, 53 CCPA 1375:

> * * * The inherency of an advantage and its obviousness are entirely different questions. That which may be inherent is not necessarily known. Obviousness cannot be predicated on what is unknown.

The Patent Office has relied on Badische-Anilin's teachings (that addition of ethers and amines to Ziegler catalysts used in polymerization of mono-olefins increases yield, rate of reaction and molecular weight) as sufficient suggestion to one skilled in the art to employ the same promoters in Crawford's diolefin polymerization processes. No doubt those factors would be persuasive evidence of obviousness were Crawford alone or in combination with Badische-Anilin to suggest that addition of promoters to a $MoCl_5$–$AlR_3$ catalyst would result in the "high-vinyl" butadiene polymer appellant obtains. Such does not appear to be the case, however. While,

as the board and solicitor have pointed out, "obviousness does not require absolute predictability," In re Pantzer, 341 F.2d 121, 52 CCPA 1135, at least some predictability is required. Here, in contrast to *Pantzer*, we find nothing in the record which would afford one of ordinary skill reason to anticipate that a trial of the Badische-Anilin "promoters" in the Crawford process would be successful in producing the polymer recited in the claims.

The examiner and solicitor have also emphasized that the product appellant produces by his process is otherwise "known in the prior art." Factual though that observation may be, we fail to see its relevance here, particularly when the record does not reflect by what prior art process or processes rubbery polybutadienes containing more than 80% of 1,2-addition units previously have been produced. Just as there may be obvious processes of producing new and nonobvious materials, see the cases collected in In re Farkas, 368 F.2d 1016, 54 CCPA ——, decided concurrently, so there may be unobvious methods of arriving at well known materials. The record here fails to demonstrate the obviousness of the presently claimed process as a means of producing the particular polybutadiene recited in the claims.

The decision is reversed.

Reversed.

SMITH, J., concurs in the result.

MARTIN, J., participated in the hearing of this case but died before a decision was reached.