**Application of James D. GEERDES.**
**Patent Appeal No. 9118.**

United States Court of Customs
and Patent Appeals.
Feb. 21, 1974.

Boris Haskell, Washington, D. C., attorney of record, for appellant.

Joseph F. Nakamura, Washington, D. C., for the Commissioner of Patents; Fred E. McKelvey, Washington, D. C., of counsel.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Judges.

MILLER, Judge.

This appeal is from the decision of the Patent Office Board of Appeals affirming the rejection of claims 2–4, 7, 8, 19, and 20 of application serial No. 689,787, filed December 12, 1967, for "Expanded Composite Materials." We reverse.

## INVENTION

The invention is a method of producing expanded or foamed polymer compositions in the absence of recognized blowing agents by milling, under high

impact and energy conditions, particles of a polymer together with submicro particles of an additive material which is essentially nonvolatile at a temperature at which said polymeric material is fluid. The mixture is confined in a mold cavity under pressure and heat sufficient to render the polymeric material fluid; and the pressure is then released, permitting the mixture to foam and solidify.

Appellant's specification states:

> The present invention relates to expanded or foamed polymer compositions. Expanded polymer compositions are well known; they are commonly formed by incorporating a blowing agent in a body of polymer material. The blowing agent may be a gas releasing solid material, or a solid or liquid material that converts to a gas under the conditions of treatment. For example, a blowing agent may be mixed and dispersed in a polymeric molding powder. When this mixture is treated under a confining pressure so as to convert the blowing agent to a gas and the polymer to a plastic or viscous fluid stage, and the pressure is then released, the pockets of compressed gas formed by conversion of the blowing agent expand, causing an expansion of the mixture as a whole. The foamed polymer then is caused to solidify in expanded state to provide the foamed structure.

The specification further states that the expanding or foaming steps may be accomplished in various environments, in particular, extrusion. In the case of extrusion the specification reads:

> As the molten material exits from the die orifice, the pressure on the material is suddenly released, and it expands before the resin sets. Continuous operation of the extruder will produce a continuous rod, ribbon or filament of foamed polymer whose cross-section shape is controlled by the shape of the die orifice. As is well understood in the art, the temperature at various stages of the extruder and at the die orifice are [sic] controlled to affect the foam properties, and secondary expansion dies may be located adjacent the extrusion orifice to control the degree of expansion of the extrudate, its cross-sectional size, and its cross-sectional shape.

After describing the milling step performed under high impact and compression energy conditions, the specification continues:

> In accordance with the present invention, it is found that particularly after the latter level of energy has been imparted to the system, the composite material can be caused to foam with a uniform and controlled expansion when treated in a manner conventionally used for generating foamed polymers by control of heat and pressure. This foam generation is obtained in the absence of any recognized blowing agent, although the foaming action of the inert filler can be supplemented by the addition to the composite of a conventional blowing agent. Despite the foam generation, the filler or additive material is still present in the composite material and performs the same function for which it would be normally used in the absence of the foaming aspect.

The following portion of appellant's specification was particularly noted by the board in its opinion:

> In practicing the present invention, the composite material was extruded using a die comprising an outlet or orifice which was extended beyond the normal heated head and with control of the temperature of the extended section.

All the claims are method claims. Claim 19 is the only independent claim (letters, paragraphing, and emphasis added):

> 19. A method of forming an expanded polymeric material comprising,
>
> A  *milling* together particles of a thermoplastic polymeric material and submicro particles of an additive material, *both said materials*

*being essentially non-volatile at a temperature at which said polymeric material is fluid,* said milling being effected by a rotary impact mill having impactors traveling at a velocity of at least about 600 linear feet per second, to form a composite of said two materials, *said composite consisting essentially of* said two materials,

B   confining said composite in a mold cavity under *pressure and heating* said composite to said temperature to render said polymeric material *fluid,*

C   *releasing* said pressure while said polymeric material is *fluid* and permitting said composite to expand as a *foam,* and

D   solidifying the foamed polymeric material with said *additive particles retained therein.*

Dependent claims 2–4, 7, 8, and 20 present preferred process conditions and materials.

## PRIOR ART

Many references were cited by the examiner, and appellant's brief concedes their teachings as follows:

Appellant has, and does acknowledge that the high energy milling [step A] of plastic and submicro additive particles to form a composite of the two materials is prior art to Appellant, this process per se being an earlier development of Appellant's assignee. Appellant has, and does acknowledge that the molding process [steps B, C, and D] is also per se prior art, it being the conventional process of forming a foamed plastic with a blowing agent (although the Examiner has not cited such prior art).

It is to be noted that the prior art references cited by the examiner with respect to the claimed molding steps involve *solid* extrusion processes, which differ from foam extrusion processes in that they are designed to solidify the extrudate by the time it leaves the orifice die.

## REJECTIONS

The board's reasons for affirming the examiner's rejection of all the claims under 35 U.S.C. § 103 were that "the claims on appeal permit the presence of a blowing agent," and that "the prior art clearly suggests the combination of the here claimed milling procedure with the molding procedure." It added that "The nature of the article obtained is not determinative of the patentability of the process."

The board also affirmed the examiner's rejection of the claims under the first and second paragraphs of 35 U.S.C. § 112, saying that "The specification appears to indicate that the success of appellant's process depends upon the use of special equipment and/or processing temperatures." It also stated that the specification "does not adequately set forth any manner, other than experimentation," of selecting both the proportions of additive to polymer ("to obtain any desired degree of expansion") and the size of the particles and the effect thereof on the properties of the product. With respect to the additives, it declared: "The claims are inclusive of materials which would not apparently be operative in the claimed process."

## OPINION

### *Scope of Claims*

■   Before considering the rejections under 35 U.S.C. §§ 103 and 112, we must first decide whether the claims include within their scope the presence of recognized blowing agents. The solicitor argues that they do, pointing out that the term "consisting essentially of" in step A does not exclude the presence of recognized blowing agents and, further, that example VII of the specification discloses the use of recognized blowing agents in the claimed process. However, *every* limitation in the claim must be given effect rather than considering

one in isolation from the others. In re Wilder, 429 F.2d 447, 57 CCPA 1314 (1970). Thus, we note that milling step A requires that the thermoplastic polymeric material and the submicro particles of additive material be "essentially non-volatile at a temperature at which said polymeric material is fluid" and, further, that the composite consist "essentially of said two materials." Step B is the initial molding step wherein the composite is placed under pressure and heated to a temperature "to render said polymeric material fluid." The pressure is released in step C, when the polymeric material is *fluid* in order to permit the composite to foam. In the final solidifying step D, the additive particles are *retained* in the solidified foamed material.

For recognized blowing agents to operate properly, they must be in a volatile or gaseous condition when the polymeric material is *fluid* and the pressure is released. However, the condition of being "essentially non-volatile" required of the materials during steps A, B, and C, and the further requirement that the particles of the additive material be *retained* in the solidified foamed material clearly negative the use of a recognized blowing agent.

Although appellant's specification indicates that recognized blowing agents *may* be added to *enhance* the foaming action of the claimed process, the scope of the claims involved in this appeal does not encompass such agents. Counsel for appellant at oral hearing affirmed that the claims exclude the presence of recognized blowing agents and that practice of example VII would not infringe the claims.[1]

In view of the foregoing, we conclude that the claims involved in this appeal exclude the presence of recognized blowing agents.

We believe it is also important to point out that the molding steps of claim 19 involve a foaming process rather than a solid molding process. This is particularly pointed out by the requirement in step C that the pressure be *released* when the polymeric material is a *fluid*. In a solid extrusion process, the pressure behind the extrusion orifice would be *maintained* so that the extrudate would be solidified by the time it leaves the orifice die. The difference between the two processes was described by appellant's counsel during oral argument as follows:

> We confine the material behind an orifice, and we keep it under pressure until it's solid or we release the pressure and permit it to expand while it's fluid, and that limitation that releases the pressure while said polymeric material is fluid distinguishes from . . . the non-foaming process.

In response to a question from the bench on how the material is extruded if it is not fluid, appellant's counsel responded:

> . . . if we could visualize the nozzle as being an elongated tube, the resin can be forced into the tube under compression as it has to be, retained under compression within the tube, the tube cooled, the resin solidified, and the material has never been released . . . from its confining pressure; there's no foam.

### THE 35 U.S.C. § 103 REJECTION

In affirming this rejection by the examiner, the board considered various prior art references involving solid molding processes and also appellant's admitted prior art foam molding process. Saying "the combination of any known molding technique" with the known milling procedure would not be unobvious, the board relied on a combination of the known milling step with either a known solid molding process or a known foam molding process. However, we do not believe it would have

---

1. Claims initially filed with the specification were broad enough to include within their scope processes, such as that illustrated by example VII, which employ recognized blowing agents. However, claims excluding recognized blowing agents were substituted for them.

been obvious to combine the milling of *nonvolatile* materials by an admittedly old process with molding steps specifying *foaming* conditions, since, in the absence of a recognized blowing agent, foaming would not be expected to occur. And the alternative combination of an old milling step with a molding process involving *solid* molding conditions is not responsive, since such a process does not meet the limitations of the claims.

The following statement by the examiner represents a clear recognition of the unexpectedness of the foamed product achieved by appellant's process, even though it was made in the context of his 35 U.S.C. § 112 rejection:

> It still is not understood how applicant produces the foamed polymeric resin which he alleges that he obtains.

Such a statement is understandable, considering the absence of any recognized blowing agent, and underscores the unobviousness of appellant's process. Appellant's citation of In re Naylor, 369 F.2d 765, 54 CCPA 902 (1966), is apposite. There we said:

> We cannot ignore the particular product unexpectedly produced by the claimed process, as the Patent Office apparently has done, in determining whether the claimed subject matter *as a whole* is obvious.

Both the examiner and the solicitor had contended that the product of the claimed process was otherwise known in the prior art, but the court rejected this argument, saying:

> Just as there may be obvious processes of producing new and nonobvious materials . . . so there may be unobvious methods of arriving at well-known materials.

See also In re Kuehl, 475 F.2d 658, (CCPA 1973).

The solicitor argues that the *Naylor* case is inapplicable, since here the examiner has questioned the sufficiency of the disclosure; whereas in *Naylor* the examiner did not do so. However, we fail to see the relevance of such a distinction to the question of obviousness for purposes of 35 U.S.C. § 103.

The solicitor further argues that the board's statement, that the nature of the article obtained is not determinative of the patentability of the claimed process, finds support in In re Swain, 154 F.2d 118, 33 CCPA 833 (1946) and In re Kanter, 399 F.2d 249, 55 CCPA 1395 (1968). Neither case appears relevant, for each dealt with application of a *known* process to novel starting materials not employed by the prior art. Here we are concerned with the unexpectedness of the product resulting from a combination of known process steps not suggested by the prior art as suitable for producing such a product.

Accordingly, we hold that the board's affirmance of the examiner's rejection under 35 U.S.C. § 103 was erroneous.

## THE 35 U.S.C. § 112 REJECTION

■ We note that the board's reasons for affirming the section 112 rejection deal only with the "how to make and use" requirements of the first paragraph of section 112 and do not treat the merits of the rejection under the second paragraph thereof. It determined that the specification was not enabling with respect to "use of special equipment and/or processing temperatures" and selection of proportions and size of particles; and it stated that "[t]he claims are inclusive of materials which would not apparently be operative in the claimed process." The question thus raised is whether the scope of enablement, provided one of ordinary skill in the art by the disclosure, is commensurate with the scope of protection sought by the claims. In re Coleman, 472 F.2d 1062 (CCPA 1973).

With respect to the board's determination concerning that portion of appellant's specification relating to the use of special equipment and/or processing temperatures, such use appears in a paragraph directed to *preferred* working conditions and illustrative examples. Also, the conditions and apparatus for

the milling process and molding techniques involved are known. For example, one of the cited references evidencing skill in the extrusion art shows annular heating and cooling chambers, and also heating elements which carefully regulate the temperature of the resin powder as it is being compressed, cured, and extruded. The area of technology involved here is not particularly complex, and there is no evidence in the record to indicate that one skilled in the art would not be able to make and use the claimed invention.

The board expressed concern that "experimentation" is involved in the selection of proportions and particle sizes, but this is not determinative of the question of scope of enablement. It is only *undue* experimentation which is fatal. In re Borkowski, 422 F.2d 904, 57 CCPA 946 (1970); In re Coleman, supra, and In re Smythe, 480 F.2d 1376, (CCPA 1973). One skilled in the extruding art would expect variations in proportions and particle sizes to affect the properties of the foamed product. Also, the specification contains a variety of examples showing different proportions and particle sizes.

Finally, we cannot agree with the board's determination that the claims are inclusive of materials which would not apparently be operative in the claimed process. The claims call for producing a *foam* and solidifying the *foam*. Having stated the objective (foamed product) together with the process steps, use of materials which might prevent achievement of the objective (by rendering the process inoperative) can hardly be said to be within the scope of the claims. We also note that the board's determination of apparent inoperativeness is unsupported by reasons or evidence. Of course, it is possible to *argue* that process claims encompass inoperative embodiments on the premise of unrealistic or vague assumptions, but that is not a valid basis for rejection. In re Cook, 439 F.2d 730, 58 CCPA 1049 (1971).

In view of the foregoing, we conclude that the scope of enablement of appellant's specification is commensurate with the scope of his claims for purposes of the first paragraph of 35 U.S.C. § 112. Also, our review of the claims satisfies us that they meet all of the requirements of the second paragraph of section 112.

Accordingly, we hold that the board erred in affirming the examiner's rejection under 35 U.S.C. § 112.

The decision of the board is reversed. Reversed.

RICH, J., concurs in the result.

