Takeshi TABUCHI and Matazo
Abe, Appellants,

v.

Robert C. NUBEL, Robert A. Fitts, and
Joseph P. Lorenzo, Appellees.

Patent Appeal No. 76–682.

United States Court of Customs
and Patent Appeals.

Decided Aug. 4, 1977.

Rehearing Denied Oct. 27, 1977.

David G. Conlin, Boston, Mass., Sewall P. Bronstein (Dike, Bronstein, Roberts, Cushman & Pfund, Boston, Mass.), attorneys of record, for appellants.

Rudolf E. Hutz, Connolly & Hutz, Wilmington, Del., attorneys of record, for appellees, Nicholas E. Oglesby, Jr., Richard T. Foster, Wilmington, Del., of counsel.

Before MARKEY, Chief Judge, RICH, BALDWIN and MILLER, Associate Judges, and SCOVEL RICHARDSON, Associate Judge, United States Customs Court.

RICH, Judge.

This appeal is from the decision of the Patent and Trademark Office Board of Patent Interferences (board) awarding priority to the juniormost party, Nubel et al. (Nubel),[1] in an interference involving three applicants. Appellant Tabuchi et al. (Tabu-

---

1. Nubel is a party on the basis of application serial No. 736,273, filed June 12, 1968, entitled "Fermentation Process for the Production of Citric Acid," and assigned to Pfizer, Inc.

chi) was junior party;[2] the senior party, Okumura et al. (Okumura),[3] is not a party to this appeal. We reverse.

### The Contested Subject Matter

The subject matter of the interference is a fermentation method of making citric and isocitric acid employing yeasts of the genus *Candida*. The single count reads:

> A method for producing at least one member of the group of citric acid and (+)-isocitric acid which comprises innoculating [sic] a citric acids-accumulating and hydrocarbon-assimilating strain of a yeast belonging to the genus *Candida* in an aqueous culture medium containing at least one normal paraffin containing 9 to 20 carbon atoms in the molecule as the main carbon source, incubating the culture until at least one of said citric acids is substantially accumulated in the culture broth and separating the so-accumulated citric acids therefrom.

### Proceedings Below

At final hearing, Nubel relied on an actual reduction to practice *prior* to the effective filing dates accorded Okumura and Tabuchi. Okumura did not present a brief or appear at final hearing. Tabuchi presented a brief and appeared, and although Tabuchi did not present any views on the merits of the actual reduction to practice asserted by Nubel, he did assert, as

he had throughout the interference, that, under 35 U.S.C. § 119, he was entitled to the date of certain of his Japanese applications which were filed prior to the Nubel actual reduction to practice. One of these applications, Japanese application serial No. 36391/1967, was filed June 7, 1967, while the other, Japanese application serial No. 79892/1967, was filed December 13, 1967. The board framed two issues for its resolution:

(1) Whether Tabuchi was entitled to the benefit of the filing dates of his Japanese patent applications?

(2) Whether Nubel had established an actual reduction to practice prior to Okumura and Tabuchi?

Both issues were resolved adversely to Tabuchi, but only the first is the subject of this appeal. We will, therefore, confine our discussion to that part of the board's opinion.

Tabuchi primarily relied on the first Japanese application, but was held not to be entitled to the benefit of its filing date under 35 U.S.C. § 119 because the board, following this court's decision in *Kawai v. Metlesics*, 480 F.2d 880, 178 USPQ 158 (CCPA 1973), found (as had the Primary Examiner) that its disclosure did not satisfy the requirements of the first paragraph of 35 U.S.C. § 112. While the board did find that Example 1 of the first Japanese application[4] did disclose "that a strain or species

---

2. Tabuchi is a party on the basis of application serial No. 783,740, filed December 13, 1968, entitled "Method for Producing Citric Acids," and assigned to Takeda Chemical Industries, Ltd. This application was accorded the benefit of the filing date of application serial No. 735,199, filed June 7, 1968.

3. Okumura was a party to the interference on the basis of application serial No. 804,269, filed March 4, 1969, and apparently assigned to Ajinomoto Co., Ltd. This application was accorded the date of Japanese patent application serial No. 13939/68, filed March 4, 1968.

4. *Example 1*

A tap-water solution of 0.2%NH4Cl, 0.05% KH2P04, 0.05%MgSO4·7H2O and 0.2% corn steep liquor is adjusted to pH 5.5, and 300–ml. creased conical flasks are respectively filled with 25ml. portions of the above medium.

After the medium is sterilized, 1g. of sterilized calcium carbonate and 1g. of sterilized kerosen [sic], decane, tetradecane or hexadecane are added. Then, each medium is inoculated with a loop of *Candida lipolytica* No. 230 from its slant culture, and the inoculated medium is incubated at 26°C on a shaker revolving at 220 r.p.m. for 8 days.

The outputs of citric acid in terms of citric anhydride against the broth (as measured by pentabromacetone colorimetry, the same applies to the subsequent examples) are 0.35% when the carbon source is kerosen [sic], 2.0% in the case of decane, 1.30% in the case of tetradecane and 2.4% when hexadecane is used as a carbon source. That is to say, in this example, the highest yield of citric acid is obtained from the culture using hexadecane as a carbon source. 100ml. of this broth is adjusted to pH 2.5 with hydrochloric acid and suction-filtered with diatomite used

of the genus *Candida* will grow on a normal paraffin having 9 to 20 carbon atoms to produce citric acid," it nevertheless concluded that the description of the yeast in that example as "*Candida lipolytica* No. 230" was not an enabling description of a strain of *Candida*. The board stated:

> The reference "No. 230" does not refer to a repository number of any strain of the genus *Candida* in any public depository. Accordingly, even if a patent is issued to Tabuchi et al. on the basis of their involved U.S. application, the public will not be able to practice the invention as outlined in Example 1 of the first Tabuchi et al. Japanese application, because the public will not have access to "*Candida lipolytica* No. 230" at that time. Since the first Tabuchi .et al. Japanese patent application does not disclose, in full, clear, concise, and exact terms a specific strain of the genus *Candida*, we fail to see how the disclosure of the first Tabuchi et al. Japanese patent application meets the requirements of 35 U.S.C. § 112, first paragraph. *In re Argoudelis, supra* [434 F.2d 1390, 58 CCPA 769, 168 USPQ 99 (1970)]; M.P.E.P. 608.01(p) [3rd Ed., Rev. 39, Jan. 1974], under the heading "DEPOSIT OF MICROORGANISMS."

Tabuchi made several arguments to avoid the board's conclusion. The most important of these was that even if the description of the *Candida* strain in Example 1 was not a complete description of a particular strain, the first Japanese application nevertheless complied with the first paragraph of 35 U.S.C. § 112 because:

(1) strains of the genus *Candida* were known and available prior to the day on which the Japanese patent application was filed, and

(2) undue experimentation would not have been required of one skilled in the art to determine which strains of the genus *Candida* will produce citric acid in accordance with the process defined by the count.

To support that argument, Tabuchi relied, inter alia, on the testimony and certain experimental work of Dr. William J. Kelleher, professor of pharmacognosy at the University of Connecticut. Dr. Kelleher was commissioned by Tabuchi to make citric acid according to the process defined by the count. Two limitations were placed on Dr. Kelleher:

(1) his choice of microorganisms was to be restricted to strains belonging to the genus *Candida*, and

(2) the strains were to be those available to the public as of the filing date of the first Japanese patent application of Tabuchi.

Dr. Kelleher selected fourteen strains of such *Candida* species, and Tabuchi's counsel selected two others. All were ordered from the following culture depositories: the American Type Culture Collection (ATCC), the Centraal Bureau voor Schimmelcultures (CBS), the Institute for Fermentation, Osaka (IFO), and the Northern Utilization Research and Development Division (formerly Northern Regional Research Laboratory) of the U.S. Department of Agriculture (NRRL). When his tests were completed, Dr. Kelleher classified each of the sixteen *Candida* as a "high producer," a "low producer," or an "insignificant producer." The high producers were:

(1) *Candida lipolytica* NRRL Y–1095;

---

as filter aid. The solid which is predominantly the yeast is washed with a small amount of water.

The filtrate is combined with the washing, and after neutralization with caustic soda, the mixture is heated, whereupon sediments are formed.

After cooling, the sediments are collected by *suction-filtration*. *The above procedure* yields 2.9g. (dry weight) of calcium citrate. The amount is equivalent to 2.2g. of citric anhydride. The calcium citrate is suspended in about 10 times volume of water, and 50%

sulfuric acid is added dropwise under stirring until the filtrate shows a faint sign of the sulfate radical in the presence of barium chloride, followed by heating in boiling water for about 30 minutes. The fluid is decolorized, if necessary, and filtered while it is hot. The filtrate is concentrated under reduced pressure at 50°–60°C, and with calcium sulfate *sediments, if any,* being filtered off, the concentration is further continued until a rather thin syrup is obtained. When this syrupy concentrate is allowed to stand in a refrigerator, citric acid crystals separate out.

(2) *Candida lipolytica* IFO 0746;

(3) *Candida lipolytica* CBS 2075;

(4) *Candida lipolytica* CBS 5699;

(5) *Candida guilliermondii* ATCC 9058;

(6) *Candida lipolytica* ATCC 8661; and

(7) *Candida lipolytica* ATCC 9773.

The low producers were:

(8) *Candida guilliermondii* CBS 2025;

(9) *Candida intermedia* CBS 5159;

(10) *Candida parapsilosis* CBS 4412;

(11) *Candida tropicalis* CBS 2323;

(12) *Candida tropicalis* ATCC 1369; and

(13) *Candida tropicalis* ATCC 9968.

The insignificant producers were:

(14) *Candida parapsilosis* CBS 1946;

(15) *Candida tropicalis* CBS 2312; and

(16) *Candida intermedia* CBS 12089.

The board found that the work of Dr. Kelleher was entitled to "little, if any weight," and gave two reasons in support of its assessment. The first was that "Dr. Kelleher * * * did not make any taxonomic study on the strains received from the depositories, notwithstanding the fact that the depositories do not guarantee that the strain supplied is the [sic] requested or that the strain is pure or uncontaminated." The second reason was that Dr. Kelleher "did not properly check for contamination" after receipt of the strains when he was subculturing and maintaining them. Thus the board found that the work of Dr. Kelleher "cannot establish that undue experimentation was not required to practice the invention defined by the count on the basis of the disclosure of the first Tabuchi et al. Japanese patent application" and further concluded that "In any event * * * the evidence as a whole establishes that Dr. Kelleher carried on a substantial amount of experimentation to determine which strains of the genus *Candida* would successfully produce citric acid."

## OPINION

■ The board erred in finding that the disclosure of the first Japanese application of Tabuchi would have compelled those of ordinary skill in the art to perform an undue amount of experimentation in their se-

lection of a strain of *Candida* suitable to produce citric acid in accordance with the method of the count.

It is quite clear from the testimony of record (if not from the count itself) that, if experimentation would have been required of those of ordinary skill in the art, such experimentation would not have amounted to more than a simple screening. Dr. Kelleher testified that he would have chosen a suitable *Candida* as follows:

A  I would probably first look in the catalogs of the American Type Culture Collection and the Centraal Bureau voor Schimmelcultures, and if a wide enough selection of Candida species specified in the application were available in these catalogs, I would order such Candida species from these culture collections.

\*    \*    \*    \*    \*    \*

A  Upon receipt of these organisms I would subculture these in an appropriate agar medium, prepare the liquid medium according to the instructions given in Example 1, inoculate the sterile liquid medium with a loopful of each of the organisms obtained, incubate on the rotary shaker, as described in Example 1.

After a period of several days of incubation, I would remove a sample from the liquid culture, acidify to approximately pH 2 with hydrochloric acid, add Celite filtering aid, filter the resulting mixture, and analyze the filtrate for citric acid with the acetic anhydride-pyridine method and, as a confirmation, with the pentabromoacetone method.

This testimony, given by Dr. Kelleher in his deposition of May 22, 1973, essentially describes the method he actually followed later in his experimental work. The appropriateness of Dr. Kelleher's approach is amply supported by the testimony of Dr. Varro E. Tyler, Dean of the School of Pharmacy and Pharmacal Sciences at Purdue University, and Dr. David Perlman, professor of pharmaceutical biochemistry and Dean of the School of Pharmacy at the University of Wisconsin. Dean Tyler testified:

A  The general method would have been from a knowledge of the literature to

determine which species or strains of Candida could utilize hydrocarbons as carbon sources, and then to obtain them from either of the investigators who had published these papers, or from culture collections, and then to utilize them in the fashion similar to Example 1.

Q235 With respect to the microorganisms, which microorganisms would you have attempted to utilize in this process at that time?

* * * * * *

A I would have used Candida lipolytica, because that is the example given.

I would also have used strains of the other species of Candida designated in the last paragraph on Page 2.[5]

Dean Perlman's testimony was similar and he specifically stated that he "would have followed, to the best of my ability, the process described in Example 1."

Thus, the record clearly shows that the only experimentation that might have been required of a person of ordinary skill in the art was a selection of various strains of Candida species mentioned in the first Japanese application, particularly strains of Candida lipolytica, the species employed in Example 1, and screening those strains for efficacy in producing citric acid by following Example 1.[6] From the testimony referred to, the screening procedure appears to be simple and straightforward, and this conclusion is supported by the testimony of Dr. Kelleher as to the actual screening which he performed.

It is not disputed that every one of the sixteen Candida strains screened by Dr. Kelleher produced some citric acid. Seven of the sixteen, including all six strains of Candida lipolytica, were denominated "high producers" by Dr. Kelleher. The record shows (and Nubel admits) that, at the most, only 15 calendar days were required for the actual screening, and, indeed, it is difficult

to attribute even this much time to it. For one thing, the record shows that eight of these days were spent waiting while the Candida cultures were incubated. The simplicity of the screening method and its success indicate that those of ordinary skill in the art would achieve success in selecting a suitable strain of Candida for the method of the count in a time comparable to that taken by Dr. Kelleher. Under these circumstances, it can hardly be said that the experimentation which might have been required of them was undue.

Nubel contends that far more time must be added to the 15 calendar days of the actual screening in determining whether undue experimentation would have been necessary. He argues that the record shows that Dr. Kelleher spent "50 working days" and required "just under 1,000" hours of undergraduate help "merely to prepare himself" for the actual screening. The record shows that the effort Nubel refers to was expended over the period extending from the spring of 1971 to a time some three weeks prior to the completion of the actual screening. However, the record also shows that the first request to Dr. Kelleher to perform an actual screening was not made until the late summer of 1972. We think it unlikely that Dr. Kelleher spent any significant amount of time between the spring of 1971 and the summer of 1972 preparing for a test which he had not yet been requested to make. The record also shows that after that first request was made, it was withdrawn and that there followed a series of requests and withdrawals until the spring of 1973, when a request finally culminated in the actual screening which was performed about that time. We think it inappropriate to charge any significant time during this period to preparation for the actual screening. The record does not reflect how much of the "50 working

---

5. The page number is a reference to the first Tabuchi Japanese patent application. The species of Candida mentioned on that page are: Candida guilliermondii, Candida intermedia, Candida lipolytica, Candida melibiosi, Candida parapsilosis, and Candida tropicalis. It will be

noted that Dr. Kelleher selected strains of five of these six species.

6. We therefore disagree with Nubel's contention that the particular strains of Candida selected by Dr. Kelleher were "unrepresentative of the Japanese application."

days" or the "just under 1,000" hours can be allocated to this period. That part of Dr. Kelleher's notebook which has been made of record on this appeal covers a period from early 1972 up to the actual screening. However, it merely refers to the subculturing and maintenance of the *Candida* strains received from the depositories. It is clear that one of ordinary skill in the art, not being subject to the vagaries of an interference proceeding, would not have suffered the scheduling problems forced upon Dr. Kelleher or be required to maintain and subculture organisms until such problems were resolved; that person would have proceeded immediately to the actual screening, as did Dr. Kelleher when finally permitted to do so. We note that Dr. Kelleher testified that he required only five hours to study the first Japanese application and to undertake the additional tests necessary to understand it.

We now turn to the board's rationale for attributing "little, if any" weight to the actual screening performed by Dr. Kelleher. While the record may show that the culture depositories from which Dr. Kelleher ordered his *Candida* strains do not offer a *guarantee* that the strain supplied is that which was ordered, the record is quite clear that a full taxonomic study was unnecessary and would not have been performed by those of ordinary skill in the art. When Dean Tyler was asked whether he would have undertaken such a study, he replied that he "would have taken the word of the Collection from which they were obtained." Later on, Dean Tyler responded to a similar question:

> Q450 In regard to the culture collections which we have specifically discussed here today, that is, the ATCC, NRRL, CBS and IFO collections, is it your experience that persons skilled in the microorganism fermentation art rely upon these culture collections for the identification of microorganisms?
>
> \*   \*   \*   \*   \*   \*
>
> A Yes, it is my understanding that they do so rely upon these collections.

Dean Perlman's testimony was to the same effect:

> Q78 In your experience of acquiring microorganisms from the American Type Culture Collection, has it been your policy to accept the strain identification indicated by ATCC?
>
> A It has.
>
> Q79 Is this true for other public culture depositories which you have utilized to obtain microorganism strains?
>
> A Yes.
>
> Q80 And you do not generally make an independent taxonomic study of these strains?
>
> A No.
>
> \*   \*   \*   \*   \*   \*
>
> Q255 You were asked some questions on cross-examination with regard to guarantee of culture collections and with respect to the American Type Culture Collection, and the Central Bureau voor Schimmelcultures.
>
> In view of the lack of guarantee of these culture collections, and in the face of a lack of guarantee of the strain designations and the taxonomy of these strains, would this inhibit you in any way from making use of the culture collections in obtaining strains from them?
>
> A No. My experience has been generally favorable. I think out of more than a thousand purchases I have only been misled once, so I would not feel inhibited if they had some minor inaccuracy.

Perhaps the most telling testimony, however, is that of Dr. John B. Routien, a mycologist for Nubel's assignee Pfizer, Inc.:

> Q86 Have you had experience in ordering and receiving organisms from the American Type Culture Collection?
>
> A Yes, I have purchased cultures since probably 1948 or 1950.
>
> Q87 In your personal experience, have the organisms which you have ordered proven, in fact, to be the organisms as described by the American Type Culture Collection?
>
> A Insofar as I can recall, every one was exactly what the American Type Culture Collection claimed it to be.

We think that this testimony, from persons obviously well qualified to speak on such matters, overwhelmingly shows that those of ordinary skill in the art rely, and are justified in relying, as Dr. Kelleher did, on the depositories for identification of the microorganisms ordered from them.

■ As to whether Dr. Kelleher "did not properly check for contamination" after receipt of the *Candida* he had ordered and while he was subculturing and maintaining them, we find that the three pages of Dr. Kelleher's testimony relied on by the board do not support its conclusion. The fact that a particular culture depository (e. g., CBS) provided for streaking[7] in conjunction with reviving its freeze-dried cultures (but not in conjunction with their subsequent maintenance and transfer) does not indicate that streaking is the only acceptable method to detect contamination in such a culture as it is received from a depository, and it has earlier been shown that the depositories are regarded as reliable. We note that the directions for reviving the freeze-dried cultures from another collection (ATCC) do not mention streaking. Thus, Dr. Kelleher's statement that he did not streak cultures from the CBS depository does not establish that he employed an unacceptable technique for detecting contamination. The remainder of Dr. Kelleher's testimony, which the board regarded as an "admission" of possible contamination, is reproduced below:

Q843 We are dealing with yeast, or alleged yeasts in these experiments. Allegedly we have 16 separate types of yeast, or at least strains.

Isn't there the possibility of cross-contamination as between these various cultures?

A A possibility, but much lower than a possibility of contamination by an airborne contaminant.

Q844 There is the possibility of both in the handling, transferring and propagation that led up to the beginning of these inter partes tests?

A Yes.

It is quite clear that Dr. Kelleher was testifying only as to the hypothetical possibility of contamination and was not testifying that such contamination had occurred. To the contrary, he testified:

Q271 Do you have any reason to believe that in the course of the transferring, that contamination of these cultures had been introduced?

A No.

For the above reasons, we hold that the board erred in according "little, if any" weight to the experimental work of Dr. Kelleher and that the board did not give proper weight to other pertinent evidence. We hold that the disclosure of the first Tabuchi Japanese application would not compel those of ordinary skill in the art to perform undue experimentation in selecting a suitable strain of *Candida* to practice the method of the count. That application thus meets the enablement requirement of the first paragraph of 35 U.S.C. § 112, and Tabuchi, therefore, is entitled to the benefit of the filing date of that application under 35 U.S.C. § 119. Since this date is earlier than the date of Nubel's actual reduction to practice, the basis on which Nubel was awarded priority, the decision of the board is *reversed*.

*REVERSED*

---

7. "Streaking" is the preparation of a "streak culture," a culture which is inoculated with an "inoculum implanted (as with a needle drawn across the surface) in a line or stripe upon a solidified culture medium." *Webster's Third New International Dictionary* (1971). As Dr. Kelleher testified, this method gives rise to separate colonies on the culture medium, and may be used to detect contamination if "the contaminating organism has a sufficiently different appearance when growing on [the] medium."